·[No. 25055. *En Banc.* October 17, 1934.]

GEORGE LEROY ALLEN *et al., Respondents,* v. MERCHANTS
FIRE ASSURANCE CORPORATION OF NEW
YORK, *Appellant.*

GEORGE LEROY ALLEN *et al., Respondents,* v. THE
NETHERLANDS INSURANCE COMPANY OF THE
HAGUE, HOLLAND, *Appellant.*[1]

*Clarke & Clarke* and *Parker W. Kimball,* for appellants.

*Joseph A. Albi,* for respondents.

TOLMAN, J.—These actions were brought to recover upon certain fire insurance policies. The cases were consolidated for trial below, and by stipulation have been consolidated for the purposes of this appeal. Trial was had to a jury, resulting in verdicts favorable

[1]Reported in 36 P. (2d) 545.

to plaintiffs; and from judgments on the verdicts, the defendant insurance companies have appealed.

The assignments of error principally relied upon question the ruling of the trial court in denying a challenge to the sufficiency of the respondents' evidence, denying a motion for an instructed verdict, and denying the motion for judgment n. o. v.

When the policies were issued, title to the property was in respondents Allen and wife, subject to a mortgage in favor of the Spokane Savings Bank. The property insured was a dwelling house, and the policies by their terms covered "only while occupied for dwelling house purposes," and also provided:

"This entire policy, unless otherwise provided by agreement endorsed hereon or added hereto shall be void . . . if the hazard be increased by any means within the control or knowledge of the insured . . ."

The policies bear the usual mortgage clause, and were deposited with the mortgagee, the Spokane Savings Bank. The Spokane Savings Bank was also the local agent of the appellant insurance companies, and through its insurance department the policies were originally issued.

While the policies were in full force and effect and in the possession of the Spokane Savings Bank, as mortgagee, Allen and wife entered into an executory contract to sell the real property, upon which the insured dwelling was situated, to the respondent Albert Commellini. The contract and a deed from Allen and wife to Commellini were placed in escrow in the escrow department of the Spokane Savings Bank, and, of course, the bank then held as mortgagee the title insurance and the fire insurance policies, and was in a position, upon full performance by Commellini, to deliver to him everything he was entitled to receive.

Everything said and done with reference to the transfer of and changes in the insurance policies, so as to protect the purchaser's interest, provide for a change of occupancy from Allen and wife, who used the house as a dwelling place only, to the purchaser, who intended to use it as a night club, a roadhouse, or at least for the principal purpose of serving dinners and refreshments to the public, took place between Allen and Commellini on the one hand and the escrow clerk of the Spokane Savings Bank on the other, and is set forth by the abstract of Mr. Allen's testimony as follows:

"I told him I wanted to escrow the contract in the bank and that I was selling the place to Mr. Commellini who was going to serve Italian dinners and that inasmuch as the insurance policies were in the possession of the bank I wanted to see that my interests were protected and at the same time I asked him to find out what the unearned premiums were and at that time he turned to a filing cabinet and gave me the figure of $36.70. Commellini was to pay me this amount. . . . I told him I was going to sell the place to Mr. Commellini and that Mr. Commellini was going to serve Italian dinners there with the view of later establishing a club. I asked him if he would see to it that the insurance would be changed to take care of it so that I would be protected as well as the bank. . . . He said, 'I will take care of it.' Commellini said something about going into business out there and serving Italian dinners and that he wanted the insurance changed so that he would be protected in the carrying on of that business. Donovan replied that the insurance would be taken care of."

Later, and after the change in occupancy had been completed, Mr. Allen again went to the escrow clerk to learn whether or not all of the details had been attended to, and testified that, on that occasion:

"This man in charge of the escrow window went to

a cabinet and looked through some papers and said, 'The insurance has been taken care of.' "

Mr. Commellini's testimony as to the conversation with the escrow clerk is to the same effect. The testimony of the escrow clerk is abstracted as follows:

"My name is Daniel I. Donovan and in 1932 I was an escrow teller in the Spokane Savings Bank. I was not an officer but simply one of the tellers working in the escrow department. . . . There was a completely separate insurance department. I believe that Mr. Wagner was in charge of the fire insurance department. There were several employees in that department, Miss McGovern being one of them. They looked after the writing up of insurance policies. . . . I recall having dealings with Mr. Allen in 1930. Defendants' Exhibit 6 is an escrow. . . . Mr. Allen came in but Mr. Commellini was not with him. I don't recall when either Mr. Commellini or Allen signed the escrow. Mr. Allen brought in a real estate contract, cross plaintiffs' Exhibit No. 3, and the deed. I made up the escrow envelope myself. . . . The envelope indicates that $2.50 each was paid by the vendee and vendor. I had quite a long conversation with Mr. Allen with relation to the real estate contract. . . . The payments on the contract were at the rate of $100. The understanding was that if Commellini was going to assume the mortgage that he wasn't going to pay Allen for about three years but was to pay the mortgage at the rate of $100 per month. That wasn't exactly right since the mortgage wasn't payable at $100 a month but at $84.95 a month. . . . I don't recall just definitely what was said about insurance, but the matter of insurance was a routine matter. Mr. Allen notified me that there would be a change of ownership but there was no discussion as to the serving of Italian dinners there. . . . Mr. Commellini never notified me that there would be any change of occupancy and that the place would be used for serving Italian dinners. With reference to the change of ownership, I notified the fire insurance department that Mr. Albert Commellini was now the

purchaser under the contract and a proper endorsement should be put on the policy to that effect. It is customary whenever it comes to our attention of a new purchaser entering into the property to notify the fire insurance department of that fact. . . . I pass on to the insurance department any information which I may have in matters of this kind. . . . In our escrow department when an escrow came in where the insurance policies were not written by the bank, it was the custom of the escrow department to pass the information as to the change of ownership on to the different insurance companies that were on the risk. It was customary as part of the service that we owed the people. We are not actually liable to do it, but we did it as a matter of service for which we were being paid. . . . I never heard of any change of occupancy and I never notified the insurance department to that effect."

On cross-examination, Mr. Donovan testified in part:

"I have a distinct recollection of Mr. Allen coming in alone. Mr. Commellini did not come in at that time. He might have come in afterwards. I don't remember of ever seeing Mr. Commellini. If he came in there on a routine matter I would probably not remember seeing him because I take in hundreds of payments. . . . I don't remember the exact conversation that took place regarding insurance for the reason that insurance was a routine matter to which I attached no particular importance. I can't exactly say what Mr. Allen told me when it was just in regard to some routine matter. A routine matter would make no impression on my mind. I can recall that he didn't say anything unusual, that is, that the occupancy of the place was being changed. I am quite certain that my memory is sufficiently clear on the whole transaction. . . . If there was something unusual it is quite likely that I would recall what was said."

We have not overlooked testimony as to certain telephone conversations, but, as we see it, they do not materially affect the situation.

194

Appellant's theory is that the escrow clerk was simply a clerk in that department of the bank, and that he had no authority, either real or apparent, to bind the insurance companies; and, in any event, that the escrow clerk was told no more than that it was intended to use the premises as a private club and for the serving of dinners, no information or knowledge being brought home to him that the place would be opened to the public as a roadhouse or place of public entertainment.

It appears from the evidence already quoted, and it is probably a matter of general knowledge, that modern business institutions such as the Spokane Savings Bank have several, perhaps many, departments, and that each department is organized and conducted on the basis of the performance of its particular duties. One desiring to obtain a loan would not go to the escrow department or to the insurance department. Nor would one desiring to procure fire insurance go to the rental or real estate sales departments.

The fact that evidences of title, insurance policies and like documents which would pass to the purchaser on full performance might be physically kept in the escrow jacket, ought not to lead anyone to believe that the escrow clerk had authority to issue policies or change the terms of the policies already written. To hold otherwise would be to ignore modern business practices with which the average person is presumed to be familiar; and as evidence that the respondent Allen so understood the situation, it may be mentioned that he notified the insurance department of the bank by letter when possession actually changed, but, unfortunately, he did not give that department notice of the change of use from that of a dwelling house to that of a place of public entertainment, which would increase the risk and the rate.

No authority is cited, and we have found none, which goes to the extent necessary to sustain the judgments appealed from. Respondents cite many authorities, of which the following are fairly representative: *Arff v. Star Fire Insurance Co.*, 125 N. Y. 57, 25 N. E. 1073, 21 Am. St. 721, 10 L. R. A. 609; *Bodine v. Exchange Fire Insurance Co.*, 51 N. Y. 117, 10 Am. St. 566; *Steele v. German Insurance Co.*, 93 Mich. 81, 53 N. W. 514; *Bennett v. Council Bluffs Insurance Co.*, 70 Iowa 600, 31 N. W. 948; *Isaac v. Donegal & Conoy Mutual Fire Insurance Co.*, 308 Pa. 439, 162 Atl. 300; *Royal Indemnity Co. v. Hook*, 155 Va. 956, 157 S. E. 414; *Barone v. Aetna Life Insurance Co.*, 260 N. Y. 410, 183 N. E. 900; *American National Bank v. Bartlett*, 40 Fed. (2d) 21.

Had the transaction here in question been had with a clerk in the insurance department of the Spokane Savings Bank, these authorities might be applicable, but none of them reach the particular point upon which this case must turn.

On the other hand, the appellants rely upon a line of cases which go beyond what is here involved, and, perhaps, further than we would care to go, but which certainly justify the holding that the escrow clerk had no authority, either real or apparent, to bind the insurance companies to a change of use greatly increasing the risk. Among such authorities are *Globe & Rutgers Fire Insurance Co. v. McGinnis*, 29 Fed. (2d) 357; *Meadows v. American Eagle Fire Insurance Co.*, 104 W. Va. 580, 140 S. E. 552; *Royal Insurance Co. v. Eggleston*, 19 Ala. App. 638, 99 So. 828; *Neiman v. Hawkeye Securities Fire Insurance Co.*, 205 Iowa 119, 217 N. W. 258. Appellants also cite and rely upon our case of *Day v. St. Paul Fire & Marine Ins. Co.*, 111 Wash. 49, 189 Pac. 95.

Many other of our cases are cited on one side or the other, such as *Henschel v. Oregon Fire & Marine Insurance Co.*, 4 Wash. 476, 30 Pac. 735, 31 Pac. 332, 765, but none are sufficiently in point to warrant analysis and discussion.

Taking into consideration every reasonable inference in favor of the respondents, we still can see here no evidence and no inference from the evidence which would warrant any reasonable mind in drawing the conclusion that the escrow clerk had any apparent authority to bind the insurance companies to a change of use which would increase the risk; and that a change of use from that of a private dwelling to that of a place of public entertainment would very materially increase the risk, is not denied.

The judgment is reversed, with directions to dismiss the action.

BEALS, C. J., MAIN, MITCHELL, MILLARD, STEINERT, and BLAKE, JJ., concur.

HOLCOMB, J. (dissenting)—I am utterly unable to agree that,

"Taking into consideration every reasonable inference in favor of the respondents, we still can see here no evidence and no inference from the evidence which would warrant any reasonable mind in drawing the conclusion that the escrow clerk had any apparent authority to bind the insurance companies to a change of use which would increase the risk; and that a change of use from that of a private dwelling to that of a place of public entertainment would very materially increase the risk is not denied."

The issues in this case were tried to a jury, which resolved the evidence in favor of respondents, including that of apparent authority and ostensible agency of Donovan. It cannot be doubted that the bank had implied authority to employ sub-agents, and that

Donovan was such sub-agent. *Lemcke v. Funk & Co.*, 78 Wash. 460, 139 Pac. 234, Ann. Cas. 1915D, 23.

The bank was both the mortgagee and, through its sub-agent, the agent of the insurance companies. Donovan, as such sub-agent, undoubtedly had the power to bind the agent, and therefore the company. He was an interested witness, and the jury, as triers of the facts, had the right to disregard his testimony. Relying upon ostensible authority, respondents dealt with him. This court is committed to the rule, well settled almost everywhere, that ostensible agency is where the principal, intentionally or for want of ordinary care, leads a third person to believe another to be his agent who has never really been employed or authorized by him.

Where a party to be charged as principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act upon such apparent agency, by reason of this lack of care, the principal is estopped to deny the agent's authority. *Violette v. Insurance Co. of Pennsylvania*, 92 Wash. 685, 159 Pac. 896, 161 Pac. 343.

The evidence in this case and the reasonable inferences to be deduced therefrom were amply sufficient to take the question of agency to the jury.

For the foregoing reasons, the judgment should be affirmed, and I dissent.

GERAGHTY, J., concurs with HOLCOMB, J.